UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

DAVID DALLAS GEORGE,

  Plaintiff,

v.               Case No. 5:16cv254-MW-HTC

CORRECTIONS CORPORATION
OF AMERICA, Q. CHADWICK,
and N. BYRD,

  Defendants.
_____/

## REPORT AND RECOMMENDATION

  Plaintiff, David Dallas George, a prisoner proceeding *pro se* and *in forma pauperis*, brought this action under 42 U.S.C. § 1983 alleging claims of deliberate indifference under the Eighth Amendment.  The matter is before the Court on Defendants' Motion for Summary Judgment (ECF Doc. 62).  The motion has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(C).  Having reviewed the motion, the evidence presented, the relevant law, and George's response (ECF Doc. 72), the undersigned recommends that the motion be GRANTED.

## I.    SUMMARY

George, an inmate at Graceville Correctional Facility ("GCF"), sues Defendants for failing to schedule a follow-up appointment for him with an outside eye specialist, which he claims was ordered for him by Dr. Tugwell in August 2013. George attributes Defendants' failure to an unwritten policy to delay medical treatment because of budgetary shortfalls.    The Defendants are Corrections Corporation of America n/k/a CoreCivic, Inc. ("CoreCivic"), the former administrator of GCF, and two (2) nurses: Chadwick, the nurse who scheduled Plaintiff's appointment with Dr. Tugwell, initialed Dr. Tugwell's report, and placed an order for his prescription glasses, and Byrd, the nurse from whom he picked up his glasses.

Defendants move for summary judgment on the following grounds:  (1) Dr. Tugwell did not recommend a follow-up visit for George with an outside specialist and thus Defendants could not have violated his constitutional rights by failing to schedule the appointment; (2) even if Dr. Tugwell had recommended a follow-up visit, Defendants did not act with deliberate indifference; and (3) George has presented no evidence to support his allegations of a budgetary shortfall or an unwritten policy to delay treatment.

## II.    RELEVANT UNDISPUTED FACTS

1.    George is an inmate of the Florida Department of Corrections currently confined at GCF, serving a life sentence without parole.

2.    Defendants Nurse Practitioners Chadwick and Byrd were employed by CoreCivic and worked at GCF during the relevant time period.

3.    Defendant CoreCivic was the administrator for GCF during the relevant time period until February 2014.

4.    On July 30, 2013, Chadwick scheduled an eye exam appointment for George to see Dr. Tugwell after George complained he could not "read, see to read and distance is blurry."  ECF Doc. 62-1 at 1.

5.    On August 22, 2013, Dr. Tugwell examined George.  Dr. Tugwell completed a DC 4-207, "blue form," called a "Consultant's Report".  ECF Doc. 62-1 at 2.  On the form, Dr. Tugwell recorded George's eye pressure as 17/17 and under the "impressions" section of the "recommendations" portion of the report, Dr. Tugwell identified George as a "glaucoma suspect".  *Id.*

6.      Under the "plan" portion of the report, Dr. Tugwell gave George a prescription for glasses and also recommended a "baseline visual field" test.[1]  *Id.* Additionally, Dr. Tugwell circled "F/U" and "PRN".[2]   The other options Dr. Tugwell could have circled for "F/U" were "1mo, 3 mo, 6mo, 12mo".  *Id.*

7.      Defendant Chadwick initialed Dr. Tugwell's report and, according to George, also ordered him the prescribed eyeglasses.

8.      Less than one month later, George signed for, and picked up, his prescription eyeglasses from Defendant Byrd.  ECF Doc. 72 at 3, ¶s 21-22; ECF Doc. 72 at 21 (Ex. 2).

9.      On January 14, 2014, George was seen at the Asthma Clinic, where he received an inhaler and also complained about knee pain.  ECF Doc. 72 at 4, ¶s 23-24; ECF Doc. 72 at 23 (Ex. 3).  He did not complain about his vision.  *Id.*

10.     Almost one year after his visit with Dr. Tugwell, on July 23, 2014, while being seen at the Asthma Clinic, George complained about his eyesight.  ECF Doc. 72 at 4, ¶ 26.  Based on this complaint, George was seen by an outside specialist, Dr. Ben Hasty, on or about September 16, 2014.  *Id.* at ¶ 27.  Dr. Hasty

---

[1] A baseline visual field test is used to help detect and monitor glaucoma and is usually taken once a year depending on the severity of glaucoma.  https://www.glaucoma.org/treatment/what-is-a-visual-field-test.php.

[2] The abbreviation "PRN" comes from the Latin word *pro re nata* and means "as needed; as the circumstances require."    *See* Webster's Medical Desk Dictionary, www.merriam-webster.com\medical.

Case No. 5:16cv254-MW-HTC

diagnosed George with angle closure glaucoma. *Id.* At that time, George's pressure reading was 30/38. ECF Doc. 72 at 36 (Ex. 6). This is the first time George was diagnosed with glaucoma. *Id.* at ¶ 28.

11. On October 3, 2014, Dr. Hasty performed a laser iridotomy on George's left eye[3], and on October 27, 2014, he performed a laser iridotomy on George's right eye.[4] ECF Doc. 72 at 39-45 (Exs. 7, 8). According to George, he has not had surgery on either eye. ECF Doc. 72 at 5.

12. CoreCivic's medical budget for the 2013-2014 year was $3,990,000, and CoreCivic expended $4,408,000, on medical that same year. ECF Doc. 72 at 25-26 (Ex. 4).

## III. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties

---

[3] Laser iridotomy surgery is used to prevent the damage that angle-closure glaucoma can cause before the actual disease sets in. *See https://www.glaucoma.org/treatment/laser-iridotomy-and-narrow-angles.php.*

[4] George claims he has lost all peripheral vision in his left eye and some in his right eye. He also says he now must have an eye exam every four (4) to six (6) months to "monitor the progression of the blindness." ECF Doc. 42 at 8. George claims to have suffered permanent and irreversible damage to both eyes, which requires prescription eye drops daily and prescription eyeglasses with tinted lenses, as a result of the delay in treatment.

will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law, and it is "genuine" if the record taken as a whole could lead a rational fact finder to find for the nonmoving party. *Id.*

Summary judgment is not appropriate "if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 594 (11th Cir. 1995). Generally, the Court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009). A plaintiff opposing summary judgment has the burden of showing that a genuine dispute on a material fact exists. *See Hutton v.* Strickland, 919 F.2d 1531, 1536 (11th Cir. 1990). However, conclusory statements alone are insufficient to meet the plaintiff's burden. *See Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1557 (11th Cir. 1993), *modified,* 14 F.3d 583 (11th Cir. 1994), *citing Bennet v. Parker*, 898 F.2d 1530, 1534 (11th Cir. 1990).

## IV.    DELIBERATE INDIFFERENCE

"The Eighth Amendment forbids punishments that are cruel and unusual in light of contemporary standards of decency." *Hernandez v. Fla. Dep't of Corr.*, 281 F. App'x 862, 865 (11th Cir. 2008). The Supreme Court has interpreted the Eighth Amendment as including a prohibition against "deliberate indifference to an inmate's serious medical needs…." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). However, "[m]edical treatment violates the Eighth Amendment only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.' Mere incidents of negligence or malpractice do not rise to the level of constitutional violations." *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991) (internal citations omitted).

To prevail on an Eighth Amendment deprivation of medical care claim, a prisoner must prove three (3) elements: (1) a serious a medical need; (2) the defendant's deliberate indifference to that need; and (3) causation. *Mann,* 588 F.3d at 1306-07. As discussed below, the undersigned finds that George has failed to establish a serious medical need or Defendants' deliberate indifference. Thus, the undersigned does not find it necessary to address the third element - causation.

## A. George Did Not Suffer From a Serious Medical Need in August 2013

To establish the first element of his claim, George must present evidence sufficient to demonstrate that he suffered a serious medical need. "[A] serious

medical need is . . . one . . . diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (internal marks omitted). "[A]n objectively serious medical need" is one so grave that, "if left unattended, [it] poses a substantial risk of serious harm." *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000) (internal quotation marks, alterations, and citations omitted). A plaintiff may also show a serious medical need by proving that "a delay in treating the need worsen[ed] the condition." *See Mann,* 588 F.3d at 1306-07.

George argues that Dr. Tugwell's diagnosis of George as being a "glaucoma suspect" is sufficient to show that he suffered a serious medical need. ECF Doc. 72 at 11. The undersigned disagrees. When read in context, Dr. Tugwell's diagnosis is insufficient to establish a serious medical need because Dr. Tugwell found the condition was one that did not require immediate treatment and recommended a follow-up up examination only "as needed".

Dr. Tugwell circled **"F/U" "PRN"**, instead of recommending a follow up examination in 1 month, 3 months, 6 months or 12 months, or an earlier time. He further set no time frame for the baseline test. Dr. Tugwell's failure to recommend an immediate follow-up examination is fatal to George's claims. *See Riddle v. Sec'y. Dept. of Corr.*, 2008 WL 4790516, *3 (M.D. Fla. Oct. 27, 2008) (facts alleged

showed that medical professional did not think immediate attention was necessary and thus plaintiff's allegations failed to rise to definition of objectively serious medical condition).  In other words, Dr. Tugwell did not diagnose George with a condition "so grave that if left unattended it poses a serious risk of harm" or one "mandating treatment." *Taylor*, 221 F.3d at 1258 (11th Cir. 2000); *Farrow*, 320 F.3d at 1243.

Additionally, George did not report any issues with his vision after Dr. Tugwell's examination until almost one year later in 2014.  Despite going to the Asthma Clinic in January 2014, for example, George did not complain about his vision or his eyes.  He also did not seek sick call for his vision or his eyes.  There is no evidence that George had any vision problems after seeing Dr. Tugwell until he went back to the Asthma Clinic in July 2014.  Indeed, George admits he did not "realize a change in his sight", as "the loss of peripheral vision happens gradually." ECF Doc. 54 at 2.

Moreover, when he was examined by Dr. Tugwell, George had an eye pressure reading of 17/17, which while slightly elevated, is within normal limits.[5]

---

[5] George alleges in his second amended complaint that a pressure reading of 17/17 is "dangerously elevated above normal."  ECF Doc. 42 at 6.  This is inaccurate.  According to the Glaucoma Research Foundation, "[e]ye pressure is measured in millimeters of mercury (mm Hg).  Normal eye pressure ranges from 12-22mm Hg, and eye pressure of greater than 22mm Hg is considered higher than normal."  https://www.glaucoma.org/gleams/high-eye-pressure-and-glaucoma.php.

Case No. 5:16cv254-MW-HTC

When he was examined in September 2014 by Dr. Hasty, his eye pressure reading was 30/38. ECF Doc. 72 at 37 (Ex. 6). Dr. Hasty's report for September 16, 2014, indicates that George's pressure was "not acceptable **today**." *Id.* (emphasis added). The fact that George was diagnosed with chronic angle-closure glaucoma over a year after he was examined by Dr. Tugwell does not mean that, when he was examined by Dr. Tugwell, he suffered from a serious medical need. *See Choate v. TDOC*, 2009 WL 1392633, *5 (M.D. Tenn. May 18, 2009) (finding that plaintiff failed to present facts showing his eye injury was "serious" at the time defendant examined him, rather than an injury that became serious over time). While "glaucoma" is a serious medical need, George was not diagnosed with glaucoma by Dr. Tugwell.

Based on these facts, no reasonable jury could find that George suffered a serious medical need in August 2013. *See Oliver v. Fuhrman*, 739 F. App'x 968, 969 (11th Cir. 2018) (finding plaintiff's complaint contained no facts demonstrating that his digestive issues were severe enough to constitute a serious medical need). Although Defendants are entitled to summary judgment because George has not shown he suffered a serious medical need, the undersigned also considered whether, assuming George could establish that his eye condition was a serious medical need, a reasonable jury could find Defendants acted with deliberate indifference.

## B. Defendants Chadwick and Byrd Were Not Deliberately Indifferent

To establish the second element of his claim, George must show Defendants knew of, and disregarded, an excessive risk to his health or safety. "[T]he official must both [have been] aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and he must also [have] draw[n] the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). George must prove (1) subjective knowledge of a risk of serious harm; and (2) disregard of that risk (3) by conduct that is more than mere negligence. *See Nam Dang by & through Vina Dang v. Sheriff, Seminole Cty. Fla.*, 871 F.3d 1272, 1280 (11th Cir. 2017).

An official disregards a serious risk by more than mere negligence "when he [or she] knows that an inmate is in serious need of medical care, but he [or she] fails or refuses to obtain medical treatment for the inmate." *Nam Dang,* 871 F.3d at 1280, citing *Lancaster v. Monroe Cty., Ala.*, 116 F.3d 1419, 1425 (11th Cir. 1997), *overruled on other grounds by LeFrere v. Quezada*, 588 F.3d 1317, 1318 (11th Cir. 2009). Additionally, a delay of treatment for obviously serious conditions can result in a constitutional violation where "it is apparent that delay would detrimentally exacerbate the medical problem, the delay does seriously exacerbate the medical problem, and the delay is medically unjustified." *Hill v. Dekalb Regional Youth Detention Center,* 40 F.3d 1176, 1187-89 (11th Cir.1994).

The second element of a deliberate indifference claim requires a plaintiff to show "a subjective intent by the public officials involved to use the sufficiently serious deprivation in order to punish." *Taylor*, 221 F.3d at 1258. "To show the required subjective intent to punish, a plaintiff must demonstrate that the public official acted with an attitude of 'deliberate indifference.'" *Id.* (quoting *Estelle*, 429 U.S. at 105). A defendant's response to plaintiff's serious medical need must be "poor enough to constitute an unnecessary and wanton infliction of pain, and not merely accidental inadequacy, negligen[ce] in diagnosi[s] or treat[ment], or even [m]edical malpractice." *Taylor* 221 F.3d at 1258, citing *Estelle,* 429 U.S. at 105–06 (internal quotation marks omitted).

One of the few factual disputes in this case is whether Dr. Tugwell recommended a follow-up visit for George with an outside eye specialist. *Compare* ECF Doc. 62 at 3, ¶s 2, 14 *with* ECF Doc. 72 at 3, ¶ 14. George argues that by recommending a baseline test for Plaintiff, Dr. Tugwell necessarily recommended that George see an outside specialist because only an outside specialist can perform the baseline field test. George does not offer any evidence or authority to support this position. On the other hand, Defendants argue the DC 4-207 "blue form" completed by Dr. Tugwell does not include a recommendation that George be seen

by an outside specialist. Instead, it merely recommended that George have a follow-up visit with Dr. Tugwell, as needed.[6]

For purposes of this motion for summary judgment, the undersigned resolves this dispute in George's favor and assumes Dr. Tugwell's recommendation that George be given a baseline test was also a referral to an outside eye specialist. Even when resolving this issue in favor of George, however, the undersigned finds a lack of evidence to show Defendants acted with deliberate indifference. In other words, even if George suffered from a serious medical need, Chadwick and Byrd are entitled to summary judgment because George has failed to show either Defendant acted with deliberate indifference. At best, George has established that Chadwick and Byrd were negligent in not scheduling a follow-up appointment for him (assuming they were aware one had to be scheduled by a certain time). Mere negligence, however, is insufficient to establish deliberate indifference. *Kelley v. Hicks*, 400 F.3d 1282, 1285 (11th Cir. 2005).

---

[6] It appears from the parties' arguments that Defendants may have treated George's reference to the "blue form" as being the one completed for Dr. Tugwell's appointment in July 2013, rather than the one completed by Dr. Tugwell in August 2013, because it was unclear which form he was referring to in his second amended complaint until he clarified same in his response in opposition to the motion for summary judgment. ECF Doc. 62 at 5, ¶s 15-16.
Case No. 5:16cv254-MW-HTC

1.  <u>Defendant Chadwick</u>

As stated above, the facts as to Chadwick show that Chadwick treated George in the Asthma Clinic in July 2013, where she helped him get an asthma inhaler, as well as an appointment with Dr. Tugwell.  ECF Doc. 62-2 at 9.  Subsequently, in August 2013, Chadwick signed the DC4-702 "blue form" completed by Dr. Tugwell. She also ordered George's prescription glasses.  Based on the fact that she initialed the blue form, George argues Chadwick knew Dr. Tugwell had recommended that George have a baseline field test.

The undersigned finds that these facts are insufficient to show that Chadwick was deliberately indifferent to George's medical needs.  These facts do not show that Chadwick had subjective knowledge of a serious medical need.  As discussed above, Dr. Tugwell's report, while recommending a baseline field test, also indicated that George should follow-up, as needed.  Dr. Tugwell did not include a date or time for scheduling that test and did not indicate anywhere on his report that there was an immediate or urgent need for the test to be scheduled.  That document alone, thus, does not show that Chadwick had subjective knowledge that George was at serious risk of harm.

In George's opposition (ECF Doc. 54) to the undersigned's Report and Recommendation for dismissal, he argued that "once the blue form is filled out and

signed, the medical staff has a set number of days to fill the Doctor's Orders."  ECF Doc. 54 at 2.  Because the objection was filed prior to discovery and was at the motion to dismiss stage, George further argued that he "does not have access to the Policies and Procedures that govern this matter and through Discovery this information will become available.  There is a set time-frame not known to George." *Id.*

George has now had the opportunity to engage in discovery and issue written requests to the Defendants.  George, however, has offered no policy or procedure to support his position that Defendants were required to act within a "set time-frame," or that they violated any policy or procedure in not scheduling him a baseline visual field test.  To the contrary, in Defendants' discovery responses, they state that "there is not a set number of days associated with the DC4-702 form."  ECF Doc. 72 at 26 (Ex. 4).

Additionally, there is also no allegation, much less any evidence, that Chadwick saw George again after August 2013.  Thus, George asks this Court to find Chadwick deliberately indifferent for not scheduling a follow-up visit for him the very same the day he saw Dr. Tugwell.  He takes this position even though George agrees Dr. Tugwell did not give a specific date for when the follow-up or

baseline test should be and there is no evidence that Chadwick was responsible for scheduling a follow-up appointment.  ECF Doc. Doc. 62-2 at 14.

Moreover, even assuming George could show that Chadwick was aware of facts from which she could infer that George was in serious risk of harm in August 2013, <u>and</u> made that inference, George has failed to present any facts to show that Chadwick acted with culpable intent.  *See e.g., Campbell v. Sikes*, 169 F.3d 1353, 1364 (11th Cir. 1999) (the official "must have a subjectively 'sufficiently culpable state of mind'") (citing *Farmer*, 511 U.S. at 838).  In prison safety cases, that culpable state of mind is the equivalent of criminal recklessness.  *See id*.  "[T]here must be at least some allegation of a conscious or callous indifference to [the] prisoner's rights, thus raising the tort to constitutional stature."  *Williams v. Bennett*, 689 F.2d 1370, 1380 (11th Cir. 1982) (internal marks omitted).

Indeed, the evidence presented by George shows the contrary to be true.  In July 2013, Chadwick treated George in the Asthma Clinic, prescribed him an asthma inhaler and helped him get an appointment with Dr. Tugwell.  ECF Doc. 62-2 at 9. George had no interactions with Chadwick prior to July of 2013, and none after August 2013.  ECF Doc. 62-2 at 9, 12.  George testified his interactions with her were satisfactory.  *Id.* at 10.  George also testified he has no reason to believe, either at the time of the incident or currently, that Chadwick had any ill will toward him

that would cause her to withhold or delay medical treatment that George required. ECF Doc. 62-2 at 10.  George also acknowledged Chadwick ordered his glasses, and did so in short order.  There is simply no evidence to show that Chadwick had a subjective intent to harm George.  Instead, the evidence shows that Chadwick helped George whenever he requested it.

Likewise, there is no evidence that Chadwick intentionally ignored a directive to schedule an appointment for George based on a non-medical reason.  Although George alleges Chadwick followed an "unwritten policy whereby staff were told to withhold and delay needed medical treatment," this is nothing more than a conclusory allegation without any supporting evidence.  ECF Doc. 72 at 11.  George has provided no evidence to support the existence of such a policy or from which the Court could reasonably infer the existence of such a policy.  As stated above, conclusory allegations or evidence setting forth legal conclusions are insufficient to meet George's burden to establish a genuine issue of material fact as to an element of his claim.  *See Bennet*, 898 F.2d at 1534.

When asked about this "policy" in his deposition, George stated he could not really explain it and, instead, gave as an example, an instance when he complained to a nurse at the asthma clinic that his knee was hurting, and she told him she could not treat him for "anything except for what they were there in front of her for" and

he would have to use sick call for other complaints.  ECF Doc. 62-2 at 11.  Despite this example, George testified he has never had any issues getting medical treatment through sick call.  ECF Doc. 62-2 at 5.  Additionally, the nurse's statement did not prevent George from complaining about his vision a few months later in July 2014.  Thus, this allegation, even if assumed true, does not show that an "unwritten policy" exists or that Chadwick followed the policy when she failed to schedule George's follow-up visit.

George also testified that Defendant Chadwick intentionally chose not to schedule his appointment with the outside specialist because "on that blue form," someone had "circled that [Plaintiff] ha[s] a chronic condition that [he] need[s] a follow-up for."  ECF Doc. 62-2 at 14.  The evidence does not support George's position.  Although "Chronic" was an option which could have been circled on the blue form completed *for* the visit with Dr. Tuggle, it was not circled on that form.  ECF Doc. 62-1 at.  Additionally, the form completed by Dr. Tugwell submitted by both parties does not contain an option for "chronic."  ECF Doc. 72 at 19 (Ex. 1).

No reasonable juror could find, based on these very limited interactions with Chadwick, the lack of any referral, recommendation or otherwise that George immediately see an outside specialist, and the lack of any complaints about eye problems from George to Chadwick after she made him an appointment with Dr.

Tugwell, that Chadwick was deliberately indifferent to a serious medical need. *See Bettis v. Holmes*, No. CV404-217, 2007 WL 1521591, at *5 (S.D. Ga. May 23, 2007) ("[A]bsent a specific complaint from plaintiff regarding his eyesight or a medical request seeking another eye examination, defendants had no indication that plaintiff's eyesight was presenting a problem or needed further medical attention.").

   2. Defendant Byrd

   The facts on which George seeks to hold Byrd liable are even more attenuated. Byrd's sole involvement in this matter is that George picked up his prescribed glasses from Byrd. According to George, he was put on a call-out for medical and when he came up "Nurse Byrd had a box of glasses, and it had paperwork with each person's glasses. I had to show him my ID. he looked over the paperwork, had me sign it, and issued my glasses to me." ECF Doc. 62-2 at 7. When asked what was on the paperwork, George responded that it had his name on it and that he was receiving glasses. *Id.* A review of the form indeed shows that it contains no additional pertinent information. ECF Doc. 72 at 21 (Ex. 2). George had no interactions with Byrd prior to picking up his glasses. *Id.*

   When asked whether Byrd was aware of the form completed by Dr. Tugwell, George stated Byrd "had to have" seen it "because he put the paperwork together for me to be able to sign it and he had to look to see these were the glasses that were

prescribed to me." ECF Doc. 62-2 at 10. George has no evidence to support this assumption. Additionally, as stated above, the "paperwork" George signed was just an acknowledgment of receipt of his glasses.

George also argues it should be sufficient for him to allege that Byrd was following "unwritten policy whereby staff were told to withhold and delay needed medical treatment." ECF Doc. 72 at 12. As with his claims against Chadwick, however, such a conclusory allegation is not sufficient to overcome a motion for summary judgment.

George also makes a vague reference in his opposition to a request for preliminary injunction he filed in August 2018, which included an injunction as to Byrd.[7] It appears that George is relying on his allegations against Byrd in the injunction to show some ill-will by Byrd toward him. Such an argument is contrary to his deposition testimony that he has no reason to believe that Byrd held any ill will toward George when George went to pick up his glasses from Byrd. ECF Doc. 62-2 at 9. Indeed, George did not know Byrd prior to that time. *Id.* Also, to the extent George is seeking to use such allegations to raise an inference that Byrd is a bad person, generally, such an argument is speculative and, as Judge Hodges noted

---

[7] George sought an injunction against Byrd as the ADA compliance nurse, alleging that Byrd was refusing him a low bunk and other rights under the ADA. George was also seeking to have the Court prevent his transfer from GCF. ECF Doc. 43.

Case No. 5:16cv254-MW-HTC

in denying the motion for injunctive relief, only "tangentially" related to the issues in this case.  ECF Doc. 43.

The undersigned finds that Byrd was not deliberately indifferent for not scheduling a baseline visual field test for George where there is no evidence that George complained to Byrd about his vision; no evidence Byrd knew a baseline visual field test had been recommended; no evidence that a baseline visual field test had been recommended for any specific period of time; no evidence that Byrd was responsible for scheduling the visit; and George's interaction with Byrd was limited to one brief encounter.

## V.    DEFENDANT CORECIVIC

George also asserts a deliberate indifference claim against CoreCivic.  He contends that CoreCivic had an unwritten policy or custom to deny or delay medical care because of budget shortfalls.

Any liability attributable to CoreCivic must be under a theory of supervisory liability.  *See Craig v. Floyd Cty,* 643 F.3d 1306, 1310 (11th Cir. 2011).  "The standard by which a supervisor is held liable … is extremely rigorous." *Braddy v. Florida Dept. of Labor and Employment Sec.,* 133 F.3d 797, 802 (11th Cir.1998).  To hold a defendant liable as a supervisory official, a plaintiff must show either (1) the supervisor personally participated in the alleged constitutional violation, or (2) there

is a causal connection between the actions of the supervisor and the alleged constitutional violation. *See Lewis v. Smith,* 855 F.2d 736, 738 (11th Cir.1988) (*per curiam*). The central tenet in both offenses is a constitutional or statutory violation. *See Mann*, 588 F.2d at 1308.

As set forth above, the undersigned finds that neither Chadwick nor Byrd violated George's constitutional rights. As such, George's claim under a theory of supervisory liability fails because the underlying § 1983 claims fail. *See Knight through Kerr v. Miami-Dade County*, 856 F.3d 795, 821 (11th Cir. 2017) ("[t]here can be no policy-based or supervisory liability when there is no underlying constitutional violation"). Thus, it is irrelevant whether CoreCivic had any policy or custom, unwritten or otherwise, to delay medical treatment. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point.").

As an additional matter, CoreCivic is also entitled to summary judgment on this claim because George has offered no evidence from which the Court could infer the existence of any budget shortfall that resulted in George's "as needed" follow up visit not being scheduled. The only evidence George can point to is that CoreCivic

spent more on its medical budget for the 2013-2014 year than it had forecasted, and he knows from working in the laundry department that money from the laundry's budget was going to medical.

The fact that CoreCivic had a budget of $3,990,000 for its medical needs during the 2013-2014 year, and spent $4,408,000 during that year does not show that CoreCivic had a policy to delay medical treatment because of budget shortfalls. ECF Doc. 72 at 5. Instead, this evidence shows that CoreCivic was willing to spend more on medical than it had budgeted. Similarly, the fact that CoreCivic used some of its laundry budget (as George alleges) to cover medical expenses shows that medical treatment was being offered (not denied). While that may have resulted in shortage of clothing (as George alleges), it does not support an inference that medical treatment was being delayed.

George's position that Defendants delayed his medical treatment because of budgetary constraints or an unwritten policy is also undermined by the medical treatment he received even prior to February 2014 (the date CoreCivic was no longer the GCF administrator). George testified, for example, that he received periodic treatment for his asthma; that he used sick-call for treatment of a rash; and that he has never had any issues getting medical treatment through sick-call. ECF Doc. 62-2 at 5. Even with regard to George's vision, he testified that even before 2013, he

complained about his vision diminishing a couple of times, and was taken to medical to read an eye chart. *Id.* at 6. Because he was able to successfully read the eye chart each time, he was not sent to a doctor. *Id.* Then, in 2013, he told the nurses he could not see the eye chart any more, and after that, without delay, Chadwick made him an appointment with Dr. Tugwell. *Id.* at 6, 9. Subsequently, he also received his prescription glasses. Then, when he complained about his vision again in August 2014, an appointment was made for him to see Dr. Hasty.

Simply, there is nothing in the record, no other incidents of delay or failure to treat, no evidence at all to support George's claims of an unwritten policy to delay treatment.

## VI.    Defendant John Doe

George has asserted a claim against "John Doe" because he claims that if Byrd and Chadwick were not responsible for scheduling a follow-up visit for him with an outside specialist, then someone else had to be. George's claims against John Doe should be dismissed for the same reasons as set forth above with regard to Chadwick and Byrd; namely, that George did not have a serious medical need and, even if he did, there is no evidence that Dr. Tugwell ordered George be seen by an outside specialist by a specific time.

George also argues that Defendants were not forthcoming in providing him with the name of the person responsible for scheduling an appointment for him, and instead responded that no such person exists. ECF Doc. 72 at 14. Regardless of whether Defendants' answer was appropriate, George did not file a motion to compel and discovery is now closed. *See* ECF Doc. 58.

Accordingly, it is respectfully RECOMMENDED:

1.      That Defendants' Motion for Summary Judgment (ECF Doc. 62) be GRANTED.

2.      That the clerk be directed to close the file.

At Pensacola, Florida, this 14th day of January, 2020.

*s/ Hope Thai Cannon*

**HOPE THAI CANNON**
**UNITED STATES MAGISTRATE JUDGE**

<u>NOTICE TO THE PARTIES</u>

Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of objections shall be served upon the magistrate judge and all other parties. A party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions. *See* U.S. Ct. of App. 11th Cir. Rule 3-1; 28 U.S.C. § 636.

Case No. 5:16cv254-MW-HTC